[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 706 
On November 5, 1996, Gary Traffanstedt sued his employer, G.UB.MK. Constructors ("GUBMK"), in the Circuit Court of Colbert County, seeking benefits under the Workers' Compensation Act. Traffanstedt alleged that he had injured his back on January 29, 1996, in a work-related accident. He claimed to have incurred a permanent total disability as a result of the accident.
Following a nonjury trial, the court entered a judgment on March 19, 1998, awarding Traffanstedt $443.00 per week as temporary total disability benefits from September 26, 1996, through December 17, 1997. The court also awarded Traffanstedt benefits based on a 60% permanent partial disability, for the period December 18, 1997, through March 19, 1998, and for the next 198 weeks. After the trial court denied GUBMK's motion for a new trial, or in the alternative, to alter, amend, or vacate the judgment, GUBMK appealed.
GUBMK argues that the trial court's finding that Traffanstedt had sustained a work-related injury that resulted in a 60% loss of earning capacity is not supported by substantial evidence; that the trial court erred in awarding Traffanstedt compensation benefits for a temporary total disability, for the period September 26, 1996, through December 17, 1997; and that it erred in awarding permanent partial disability payments that exceed the maximum weekly compensation benefits for permanent partial disability as mandated by § 25-5-68(a), Ala. Code 1975.
"In reviewing the standard of proof set forth [by the Workers' Compensation Act] and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness." § 25-5-81(e)(1), Ala. Code 1975. "In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." §25-5-81(e)(2). The Supreme Court of Alabama has defined the term "substantial evidence" as "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." Ex parte Trinity Industries, Inc., 680 So.2d 262, 268
(Ala. 1996) (quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989)).
At the time of trial, Traffanstedt was 44 years old. He had attended the 12th grade in school, but did not graduate. He had obtained a G.E.D. certificate. In 1979, Traffanstedt began a boilermaker apprenticeship, and, in 1982, he obtained journeyman status. GUBMK employed Traffanstedt through the boilermakers' union as a boilermaker mechanic, and he had worked for GUBMK for approximately eight or nine months before he was injured. Before the injury, GUBMK was paying Traffanstedt $18.70 per hour, and Traffanstedt had an average weekly wage of $757.60.
On January 29, 1996, while he was pulling a wagon backwards off a freight elevator in the Colbert Steam Plant, Traffanstedt stepped into a hole in a floor grate. This caused him to fall backwards and to land on his coccyx. Traffanstedt immediately notified his foreman of the injury. Traffanstedt testified that because of a snowstorm he was off work for the next two days, but that when he returned to work he informed GUBMK that he needed to see a doctor because of the injury.
GUBMK sent Traffanstedt to Dr. George Evans, who made X-rays and gave Traffanstedt a prescription for Lorcet Plus, a pain medication. Traffanstedt took Lorcet Plus to control his pain, from January 1996 through September 1996 and again from January 1997 through the date of trial. Because Dr. Evans restricted Traffanstedt from climbing, heavy lifting, and prolonged standing, Traffanstedt sat in a toolroom during his shift at GUBMK and did no work from February 8, 1996 until April 5, 1996, when GUBMK laid him off from work.
GUBMK then sent Traffanstedt to Dr. Marc Michaud, an orthopedic surgeon. After examining Traffanstedt on April 8, 1996, Dr. Michaud determined that Traffanstedt had a compression fracture of the T12-L1 disc. *Page 707 
Dr. Michaud testified during his deposition that a compression fracture of the T-12 disc is treated conservatively with rest, restricted work, sometimes with a brace, but usually without surgery. After this visit, Dr. Michaud sent Traffanstedt to a HealthSouth clinic in Muscle Shoals for therapy for one month and told him not to work.
Dr. Michaud testified that after reviewing the HealthSouth report, which stated that Traffanstedt was fit for the "medium work" category, and after examining Traffanstedt on September 25, 1996, he told Traffanstedt that he had no other medical assistance to offer him. Traffanstedt never returned to work, but visited Dr. Michaud again on February 19, 1997, complaining of constant back pain. During this visit, Dr. Michaud made X-rays of Traffanstedt's back and determined that there was a complete loss of the T12-L1 disc. Also, Dr. Michaud determined that Traffanstedt "had a spur that was going from T12 going to L1" and that the spur might increase in size. Dr. Michaud testified that while the spur is forming, it will cause pain for three to five years. However, Dr. Michaud noted that Traffanstedt could do light-duty work with no constant bending or stooping and no lifting in excess of 25 pounds, Dr. Michaud reported that Traffanstedt had reached maximum medical improvement on October 1, 1996, and that he had a permanent physical impairment of eight percent as a result of the accident.
In an attempt to manage his pain, Traffanstedt attended the Montclair Pain Rehabilitation Institute from November 24, 1997, through December 19, 1997. Dr. Daniel Doleys, who is a licensed psychologist and a member of the Montclair Pain and Rehabilitation Institute, testified that when Traffanstedt was discharged from Montclair his pain level had improved by 15%, and he stated in Traffanstedt's discharge summary that he had reached maximum medical improvement on December 19, 1997.
GUBMK first argues that the trial court's finding that Traffanstedt had sustained a work-related injury resulting in a 60% loss of earning capacity is not supported by substantial evidence. Specifically, GUBMK argues that the trial court judge ignored the testimony of its expert witness, Renee Smith, who testified that Traffanstedt had incurred a vocational loss of only 30%.
At trial, Traffanstedt presented the oral testimony of Thomas M. Elliot, a vocational rehabilitation expert. Elliot had conducted a vocational assessment of Traffanstedt and had administered the Wechsler Adult Intelligence Scale — Revised. Elliot determined that Traffanstedt's academic skills range from the third-grade level to the sixth-grade level of ability and that he has marginal academic skills in reading, spelling, and arithmetic. After reviewing Dr. Michaud's deposition, Elliot testified that Dr. Michaud's restrictions of no constant bending, stooping, or repetitive flexion and extension, and no lifting in excess of 25 pounds would prevent Traffanstedt from performing the work duties of a boilermaker. Elliot concluded:
 "Based on all the vocational factors, including his age, his educational background, his academic skills, his intellect, his past relevant work history, the functional limitations indicated by Dr. Michaud, his subsequent loss of wage earning, I determine that he would have an occupational disability rating of approximately 60 to 65 percent."
However, after reviewing the material submitted to him from Montclair Pain Rehabilitation Institute and the deposition of Dr. Doleys, which was introduced at trial, Elliot raised his estimate of Traffanstedt's vocational disability rating to 75% based on Traffanstedt's significant loss of wages from the boilermaker's hourly pay and his considerable loss of access to the labor market.
Donald Parsons, a certified vocational evaluation specialist, wrote in his vocational assessment that Traffanstedt is capable of performing work that is defined as "light." However, Parsons stated that, according to the United States Department of Labor, a boilermaker's work is skilled work that typically imposes heavy physical demands. Also, Dr. Doleys and Dr. Dennis Doherty, both on the staff of the Montclair Pain and Rehabilitation Institute, noted in Traffanstedt's discharge summary that the job of boilermaker is skilled heavy work. Furthermore, Parsons, *Page 708 
like Elliot, concluded that Traffanstedt has marginal academic skills.
Renee Smith, a vocational evaluator, testified on behalf of GUBMK that she thought Traffanstedt had incurred a vocational loss of only 30% as a result of the accident. Her finding of a 30% vocational loss is based on Traffanstedt's pain complaints and on her concern that his job as a boilermaker was somewhere between the "medium" and "heavy" work categories. Smith testified that although Dr. Michaud believed Traffanstedt could go back to his former job, she had "some concern about him going back as a boilermaker per se" because of "the amount of bending and crawling in . . . that particular location."
Smith said she believed Traffanstedt could work at several other jobs, including the job of parts clerk, utility worker, welder, auto detailer, mechanic, small engine repairman, and inspector. Smith stated that the top pay for those jobs ranges from $6.50 to $8.00 per hour. Therefore, Smith concluded that if Traffanstedt could not work as a boilermaker, the highest rate of pay he could earn would be $8.00 per hour.
Smith performed a vocational evaluation of Traffanstedt based on the assumption that he could not work as a boilermaker. She determined that Traffanstedt would have sustained a 45% loss of ability to earn. In arriving at that percentage, Smith considered the loss of access to the job market and the difference in Traffanstedt's earnings as a boilermaker and his potential earnings of $6.50 to $8.00 per hour.
GUBMK argues that the trial court completely ignored Smith's testimony. However, this argument is without merit. The trial court judge spent a considerable amount of time questioning Smith about how she could find a 30% vocational loss if Traffanstedt had an $18.70 per hour earning capacity as a boilermaker and only a $6.50 to $8.00 per hour earning capacity if he could not return to work as a boilermaker. The trial court stated in its findings that Elliot's estimate of a 60% loss of earning capacity was more credible than Smith's estimate.
"The trial court has much discretion in determining the loss of ability to earn and may consider such factors as age, education, past work history, and the effect of the injury on the employee's earning ability." Paschel v. Emro Mktg. Co., 632 So.2d 971, 973
(Ala.Civ.App. 1993). The trial court's findings based on conflicting testimony are conclusive where there is substantial evidence to support the findings. Edwards v. Jesse Stutts, Inc.,655 So.2d 1012, 1014 (Ala.Civ.App. 1995); Guster v. GoodyearTire Rubber Co., 611 So.2d 370, 371 (Ala.Civ.App. 1992); andFisher v. Bruno's Food Stores, Inc., 588 So.2d 488, 490
(Ala.Civ.App. 1991). The 1992 Workers' Compensation Act did not alter the rule that appellate courts do not weigh the evidence presented before the trial court. Edwards v. Jesse Stutts, Inc., supra. After carefully reviewing the record, we find that substantial evidence to support the trial court's finding that Traffanstedt had sustained an on-the-job injury resulting in a 60% loss of earning capacity.
Second, GUBMK argues that the trial court erred in awarding Traffanstedt temporary total disability compensation benefits for the period September 26, 1996, through December 17, 1997. Temporary total disability pertains to "the healing period during which an employee is recovering and unable to work." Ex parteMoncrief, 627 So.2d 385, 387 (Ala. 1993) (quoting Haywood v.Russell Corp., 611 So.2d 365, 367 (Ala.Civ.App. 1992); andHillery v. MacMillan Bloedel, Inc., 717 So.2d 824 (Ala.Civ.App. 1998)).
"It has repeatedly been held that the `time of temporary total disability' is the recovery period that lasts until maximum medical recovery is reached." Ex parte Moncrief;
627 So.2d at 387-88 (quoting Haywood v. Russell Corp., 611 So.2d at 367);Hillery v. MacMillan Bloedel, Inc., supra; and Ex parte DCHRegional Medical Center, 571 So.2d 1162, 1164 (Ala.Civ.App. 1990). When maximum medical improvement ("MMI") is reached depends on the circumstances of the particular case. Hillery v.MacMillan Bloedel, Inc., supra; and Pemco Aeroplex, Inc. v.Johnson, 634 So.2d 1018, 1020 (Ala.Civ.App. 1994). *Page 709 
There was substantial evidence suggesting that Traffanstedt did not reach MMI until December 19, 1997. Dr. Michaud testified during his deposition that Traffanstedt had a compression fracture of the T-12 disc and that this injury is the cause of his pain. Traffanstedt had taken Lorcet Plus for his pain, from January 1996 through September 1996, and he had been taking it again from January 1997 through the date of trial.
After examining Traffanstedt on June 2 and 3, 1997, Dr. Doleys concluded that Traffanstedt had not reached MMI and he recommended that Traffanstedt obtain pain treatment. Also, Elliot testified that pain treatment is beneficial in restoring an employee to substantial gainful activity if the treatment can relieve the employee's pain. Furthermore, Smith, GUBMK's expert witness, testified that she would not recommend that an employee work while suffering severe pain.
On November 13, 1997, after the trial, the trial court ordered GUBMK to provide Traffanstedt with treatment at the Montclair Pain Rehabilitation Institute. Traffanstedt was treated at that Institute from November 24, 1997, through December 19, 1997. Dr. Doleys testified that when he was discharged from Montclair, Traffanstedt's pain had decreased by 15%. In Traffanstedt's discharge summary from Montclair, Dr. Doleys and Dr. Doherty stated that Traffanstedt had reached maximum medical improvement on December 19, 1997.
GUBMK argues that the judge should have found the date of MMI to be October 1, 1996, the date Dr. Michaud gave as the date Traffanstedt reached MMI. Citing § 25-5-77(a), Ala. Code 1975 and City of Auburn v. Brown, 638 So.2d 1339 (Ala.Civ.App. 1993), GUBMK argues that Dr. Michaud was Traffanstedt's "treating physician" and that Dr. Michaud's determination of MMI should control.
The date of MMI indicates the date on which the claimant has reached such a plateau that there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability. The trial court has the duty to determine the extent of disability, and it is not bound by the testimony of expert witnesses in making that determination. Fuller v. BAMSI,Inc., 689 So.2d 128, 131 (Ala.Civ.App. 1996); Patterson v.Clarke County Motors, Inc., 551 So.2d 412, 417 (Ala.Civ.App. 1989); Edgewood Serv. Center v. Hogan, 440 So.2d 1076
(Ala.Civ.App. 1983). In determining a worker's disability, the trial court "should consider all the evidence, including its own observations, and interpret such evidence according to its own best judgment." Patterson v. Clarke County Motors, Inc., 551 So.2d at 417, citing Edgewood Service Center v. Hogan, supra.
Although we agree that the treating physician's opinion as to the date of MMI should be given great weight, the trial court did not err by finding Traffanstedt entitled to temporary total disability compensation benefits from September 26, 1996, through December 17, 1997.
Third, GUBMK contends that the trial court erred in awarding permanent partial disability payments in excess of the statutory weekly benefit. We agree.
GUBMK paid Traffanstedt temporary total disability benefits of $443.00 per week for 25 weeks, from April 5, 1996, through September 25, 1996. However, GUBMK did not pay Traffanstedt any other disability benefits before the trial court entered its judgment. On March 18, 1998, the trial court entered a judgment awarding Traffanstedt $443.00 per week as temporary total disability for the period from September 26, 1996, through December 17, 1997. Also, the trial court awarded Traffanstedt "permanent partial disability from December 18, 1997 to March 19, 1998 in the sum of $265.80 per week, being 60% of $443.00 or $3,455.40" This amount represents the accrued permanent partial disability benefits for the period for which the court found a temporary total disability, through the date of the trial court's final judgment. The trial court also awarded Traffanstedt permanent partial disability benefits in the amount of "$256.80 [sic] per week for the next 198 weeks as compensation for permanent partial disability."
Section 25-5-57(a)(3)g. provides the compensation for permanent partial disabilities *Page 710 
not enumerated in subsections a. through f. Section25-5-57(a)(3)g. states:
 "[T]he compensation shall be 66 2/3 percent of the difference between the average weekly earnings of the worker at the time of the injury and the average weekly earnings he or she is able to earn in his or her partially disabled condition, subject to the same maximum weekly compensation as stated in Section 25-5-68. . . ."
(Emphasis added). Section 25-5-68(a) states
 "[T]he maximum compensation payable for permanent partial disability shall be no more than the lesser of $220.00 per week or 100 percent of the average weekly wage."
Therefore, Traffanstedt is entitled to only $220 per week for his permanent partial disability. The trial court incorrectly awarded Traffanstedt permanent partial disability benefits of $265.80 per week for the period December 18, 1997, through March 19, 1998, and $256.80 per week for 198 weeks.
Further, the attorney fee, which was calculated on the basis of the judgment at the rate of 15 percent, must be reduced and adjusted based on the amended judgment, to bring the award into conformity with the Workers' Compensation Act. See §25-5-90(a), Ala. Code 1975.
The judgment is due to be affirmed in part and reversed in part and the cause remanded with instructions for the court to enter an order consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and MONROE and CRAWLEY, JJ., concur.
YATES, J., concurs in the result.