Nacola Ruggs sued her employer, Masterbrand Cabinets, Inc., f/k/a NHB Industries, Inc. ("Masterbrand"), on August 8, 2001, seeking to recover workers' compensation benefits for injuries she sustained during the course of her employment with Masterbrand. Ruggs amended her complaint on August 13, 2002, to allege a retaliatory-discharge claim pursuant to § 25-5-11.1, Ala. Code 1975. The retaliatory-discharge claim was purportedly severed by the trial court, and the workers' compensation claim proceeded to trial.[1] Following an ore tenus proceeding, the trial court, on April 22, 2003, entered an order finding Ruggs to be 100% permanently and totally disabled. Masterbrand appeals.
This case is governed by the 1992 Workers' Compensation Act, §25-5-1 et seq., Ala. Code 1975 ("the Act"). The Act provides that an appellate court's review of the standard of proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala. Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our supreme court "has defined the term `substantial evidence,' as it is used in § 12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262, 268
(Ala. 1996), quoting West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989). This court has also concluded: "The [1992 Workers' Compensation] Act did not alter the rule that this *Page 871 
court does not weigh the evidence before the trial court."Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014
(Ala.Civ.App. 1995).
Ruggs was 35 years old at the time of the trial, had completed the 8th grade, and had obtained a GED. Ruggs's employment history consisted primarily of unskilled to semi-skilled jobs that required light to medium levels of exertion. She was employed by Masterbrand in June 2000, as a "dowler operator." This job was an unskilled position that required a light level of exertion.
Ruggs testified that on August 7, 2000, she was "catching boards" off the dowler machine and stacking them. She stated that the boards were so large that she had to catch them with both hands. Ruggs testified that as she was taking one board off the dowler machine "[the board] kicked sideways" and her left wrist "popped." Ruggs reported the accident to her supervisor. Ruggs stated that her supervisor told her to attempt to return to work; however, she stated that because her wrist continued to hurt she visited the company nurse. The nurse "iced down" Ruggs's hand and scheduled her an appointment with Dr. D. Leigh Murphy.
Dr. Murphy ordered an X-ray examination, which was negative. He diagnosed Ruggs with a sprained left wrist; prescribed an over-the-counter medication; placed her hand in a splint; and restricted her from using her left hand, including prohibiting her from lifting or pulling. Dr. Murphy continued to treat Ruggs's left wrist conservatively, and he eventually returned her to full-work duty on September 6, 2000. However, Ruggs continued to experience pain and weakness in her left hand, and, as a result, Dr. Murphy referred her for an orthopedic evaluation.
Ruggs was seen by Dr. Sharon L. Colgin, an orthopedic surgeon, on February 22, 2001. Dr. Colgin noted at that time that Ruggs complained of pain over the dorsal and ulnar aspects of her left wrist. A physical exam of Ruggs's left wrist indicated that Ruggs had tenderness and swelling in the wrist and that she had a limited range of motion in the wrist. Dr. Colgin suspected that Ruggs had a cartilage tear in her wrist and recommended arthroscopic surgery with a possible debridement of the cartilage.
Dr. Colgin performed arthroscopic surgery on Ruggs's wrist on March 9, 2001. During surgery, Ruggs was indeed found to have a cartilage tear in her wrist, which Dr. Colgin debrided. Dr. Colgin also found that Ruggs had severe synovitis and a partial tear of the scapholunate interosseous ligament. Dr. Colgin also debrided these areas. Ruggs returned to Dr. Colgin on March 22, 2001. Ruggs stated that at that time some of her pain had decreased but that she still had a burning pain in her hand and wrist. Dr. Colgin noted that Ruggs had some swelling in her hand and wrist as well as a limited range of motion. Dr. Colgin noted that she wanted to prescribe two weeks of physical therapy to see if Ruggs's wrist and hand pain improved but that if it did not improve Ruggs would probably need to have her scapholunate interosseous ligament reconstructed.
Ruggs returned to Dr. Colgin on April 5, 2001, complaining of a recurrence of her pain during physical therapy. Dr. Colgin noted at that time that Ruggs had tenderness and swelling in her wrist and that she had no significant improvement after surgery. Dr. Colgin recommended a second surgery in order to reconstruct Ruggs's scapholunate interosseous ligament.[2] *Page 872 
Dr. Colgin performed a left scapholunate interosseous ligament reconstruction on Ruggs on October 12, 2001. Ruggs returned to Dr. Colgin on October 25, 2001. Dr. Colgin noted at that time that Ruggs had moderate swelling in her hand and fingers but that she was doing well following the second surgery. Ruggs returned to Dr. Colgin on November 27, 2001. Dr. Colgin noted some moderate swelling in Ruggs's hand, wrist, and forearm, but again noted that she was doing well. Ruggs was seen again by Dr. Colgin on December 11, 2001; Dr. Colgin stated at that time that Ruggs was doing "quite well" after the second surgery. Dr. Colgin noted that Ruggs's pain and swelling had decreased and that she complained only of finger stiffness. Dr. Colgin prescribed physical therapy for Ruggs at that time.
Ruggs's physical therapist noted on January 21, 2002, that the grip strength and range of motion in Ruggs's left hand and wrist had increased and that her swelling had decreased. The therapist recommended progressing the therapy to more aggressive tasks, including a work conditioning program. Ruggs's work conditioning included stacking, lifting, bending, and other types of activities designed to simulate the types of activities she would perform when she returned to work at Masterbrand. Ruggs performed the conditioning program for approximately four to five hours per day, five days per week.
Ruggs returned to Dr. Colgin on February 19, 2002. Dr. Colgin noted at that time that Ruggs had made progress in physical therapy but that she still had significant stiffness in her wrist and that she was frustrated by the lack of return of her wrist extension and flexion. Dr. Colgin further noted that Ruggs had attempted to increase her activities with some success and with less pain. Ruggs was next seen by Dr. Colgin on March 19, 2002, and she was accompanied by her physical therapist. Dr. Colgin noted at that time that Ruggs was "gaining significant motion" in her wrist and that her therapist "feels that she is making great progress." Dr. Colgin further noted that Ruggs's grip strength had improved to 50 pounds in her left hand compared to 80 pounds in her right hand and that she is "definitely making significant improvement" in response to therapy. Dr. Colgin requested that the therapist perform a functional capacity evaluation ("FCE") and an impairment-rating calculation.
Ruggs underwent an FCE, which was performed by her physical therapist, on April 19, 2002. The FCE indicated that Ruggs's range of motion in her left wrist had improved and that her left-hand-grip strength had improved from 15 pounds at the beginning of her physical therapy to 46 pounds. The FCE restricted Ruggs's use of her left wrist and hand to occasionally lifting 25-30 pounds from floor to waist; to occasionally lifting 20 pounds overhead; to occasionally carrying 25-30 pounds with both hands; to occasionally carrying 15-20 pounds with one hand; to occasionally reaching overhead; and to occasionally gripping and grasping things with her left hand. The FCE placed Ruggs in the medium-work category and stated the following:
 "We would anticipate difficulty with left handed tasks that place stress on the wrist especially a `radial type stress.' We would also anticipate trouble with tasks that demand a full extension of the wrist. Pushing up onto objects (or up *Page 873 
from objects) with a full extension should be avoided as the [range of motion] is insufficient for these tasks. Repetitive work that requires moderate + exertion of the left hand should be avoided."
The therapist assigned Ruggs an impairment rating of 12% to the whole person and 20% to the left upper extremity.
Ruggs returned to Dr. Colgin on April 30, 2002, complaining that she still experienced pain in her wrist on occasion, especially when the weather changed. Dr. Colgin noted that Ruggs has the most difficulty when trying to push herself out of a chair or when pushing down forcibly with her wrist extended. Dr. Colgin further noted that Ruggs had limited extension capability in her wrist with the most limitations to flexion. Other than those complaints, Dr. Colgin noted that Ruggs stated that she has done "quite well especially with therapy." Dr. Colgin noted that Ruggs fully participated in the FCE without self-limiting and that she concurred with its findings. Dr. Colgin agreed with the impairment rating assigned by the therapist and determined that Ruggs had reached maximum medical improvement at that time. She released Ruggs to return to work adopting the restrictions set forth in the FCE as her permanent work restrictions.
Ruggs testified that her condition has progressively worsened since her second surgery. She testified that she experiences swelling and constant pain in her left wrist and hand, which she rates at a 4 to 6 on a scale of 10. Ruggs stated that her pain increases with exposure to cold and with routine activity. She testified that she elevates and massages her arm approximately three to four hours per day in an attempt to relieve the pain and swelling. She further testified that she uses an electrical-stimulation unit on her arm approximately two and one-half hours per day. Ruggs stated that she takes over-the-counter medication for her pain and Ambien, which was prescribed by Dr. Colgin, to help her sleep.
Ruggs testified that before her work-related accident she played softball, volleyball, tennis, and rode horses. She stated that since she sustained her injury she is no longer able to play softball, volleyball, and tennis. She stated that she only occasionally rides horses and that she needs assistance to saddle and mount the horse. Ruggs stated that she needs assistance when grocery shopping and that she performs her household chores with one arm. She further stated that she cannot pick up her grandchildren and that the constant pain has caused her to become withdrawn and irritable. Ruggs testified that she is unaware of any job that she can perform. On cross-examination, Ruggs testified that although her pain had increased since April 2002 she had not sought any additional treatment for her left wrist and hand.
Ruggs presented evidence indicating that she was 100% vocationally disabled. Masterbrand presented evidence indicating that Ruggs was 21% vocationally disabled.
Masterbrand argues that the trial court's findings of facts and conclusions of law are based in part on an injury that is not supported by the evidence contained in the record. We agree. In its judgment, the trial court found that Ruggs suffered an "on-the-job injury to her left wrist, arm, forearm and shoulder arising out of and in the course of [her] employment." The court also found that she "experiences constant pain on a moderate to moderately severe level and this includes pain to her left wrist, left forearm, left elbow, and left shoulder. . . ." A review of the evidence contained in the record does not support a *Page 874 
finding that Ruggs has suffered an injury to her left elbow or shoulder. Nothing in the record indicates that Ruggs ever complained of, or was ever treated for, a left elbow or shoulder injury. Accordingly, we must reverse that portion of the trial court's judgment that finds that Ruggs has suffered an injury to her left elbow and shoulder.
Masterbrand next argues that the trial court's award of permanent disability benefits was premature, because, it says, Ruggs's own expert stated that her condition was treatable. Ruggs's vocational expert testified that Ruggs was permanently and totally disabled at this point; however Ruggs's vocational expert also testified that if Ruggs's pain could be reduced and managed there was a possibility that she could return to some form of employment in the future. "In order to recover permanent total disability benefits, an employee must have reached maximum medical improvement." R.L. Carnes Logging Contractors, Inc. v.Whitsett, 844 So.2d 1248, 1256 (Ala.Civ.App. 2002). When an employee reaches maximum medical improvement depends on the circumstances of the particular case. G.UB.MK. Constructors v.Traffanstedt, 726 So.2d 704 (Ala.Civ.App. 1998). "The date of [maximum medical improvement] indicates the date on which the claimant has reached such a plateau that there is no further medical care or treatment that could be reasonably anticipated to lessen the claimant's disability." 726 So.2d at 709. In this particular case, Ruggs's vocational expert stated that it was only a possibility that she could return to some form of employment in the future if her pain could be reduced and managed. Further, Dr. Colgin, Ruggs's authorized treating physician, concluded that Ruggs had reached maximum medical improvement on April 30, 2002. Accordingly, we cannot say that the trial court erred in awarding Ruggs permanent disability benefits.
Masterbrand next argues that the trial court erred in treating Ruggs's left wrist and hand injury as an injury to the body as a whole rather than as an injury to a scheduled member. InDrummond Co. v. Key, 854 So.2d 1159, 1164-65 (Ala.Civ.App. 2002), this court stated:
 "Our supreme court, in Bell v. Driskill, 282 Ala. 640, 213 So.2d 806 (1968), set forth the test for determining when an injury should be treated as an injury to the body as a whole rather than as an injury to a scheduled member. Recently, our supreme court, in Ex parte Drummond Co., 837 So.2d 831
(Ala. 2002), overruled Bell and its progeny, and restated the test for determining whether an injury to a scheduled member should be treated as an injury to the body as a whole. In overruling Bell, our supreme court stated:
 "`[T]he Bell test permitted an injury to a scheduled member to be compensated outside the schedule if the effect of the injury extends to other parts of the body and produces a greater or more prolonged incapacity than that which naturally results from the injury to the specific member. However, the Court of Civil Appeals has substantially expanded the Bell test to include, as effects that will take the injury outside the schedule: (1) pain, swelling, and discoloration; (2) work restrictions; (3) impairment ratings to the body as a whole; and (4) vocational disabilities. It also appears that the Court of Civil Appeals has considered the worker's ability to find future employment as a factor in deciding whether an injury to a scheduled member should be compensated outside the schedule.'
 "Ex parte Drummond, 837 So.2d at 834 (footnotes omitted). The supreme court *Page 875 
restated the test for determining whether an injury to a scheduled member should be treated as unscheduled as follows: "`[I]f the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'" 837 So.2d at 833, quoting 4 Lex K. Larson, Larson's Workers' Compensation Law § 87.02 (2001)."
Ruggs testified as follows:
 "Q. Is the use of your left arm, unable to use your left arm increasing the use of your right arm?
"A. Yes.
"Q. And what effect is that having on your right arm?
"A. A lot.
"Q. Tell the court what.
 "A. There's days that I have pain in my right hand that hinders the use of doing pretty much anything. Just the constant use of my right hand has done got to where it's bothering me real bad.
 "Q. And was that already showing up when you were in the work hardening program?
"A. At times, yes.
 "Q. And the work hardening program, did you make that known to them?
"A. Yes.
"Q. And did they ice your right arm, too?
"A. Yes.
 "Q. Try to treat the pain you were having in your right arm?
"A. Yes.
"Q. And were you having swelling in your right arm?
"A. At times, yes."
Dr. Colgin examined Ruggs on August 2, 2001, and noted at that time that she was experiencing pain in her right wrist. Additionally, a note from a physical therapy session on December 27, 2001, indicates that Ruggs received a "cold pack" to her right wrist in order to decrease pain and swelling that she was experiencing in that wrist. Further, a report prepared by Ruggs's vocational expert indicates that her right wrist had become symptomatic because of its increased use. The trial court found that pain in Ruggs's left upper extremity "has caused her to favor her left extremity and have an increased use of her right extremity and she is now suffering tingling and pain in her right [upper] extremity. . . ."
We conclude that Ruggs presented substantial evidence indicating that the effect of the injury to her left hand and wrist extended to her right upper extremity because of the resulting overuse of her right upper extremity and that her injury to her left hand and wrist hinders her ability to use her right upper extremity. Accordingly, we conclude that the trial court did not err in treating Ruggs's left hand and wrist injury as an injury to the body as a whole.
The trial court's finding that Ruggs has suffered a 100% total disability was based in part on a finding that Ruggs has suffered an elbow and shoulder injury. Because the finding of an elbow and shoulder injury is not supported by substantial evidence, we must reverse that portion of the trial court's judgment finding that Ruggs has suffered a 100% total disability and remand this case for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
CRAWLEY, THOMPSON, PITTMAN, and MURDOCK, JJ., concur.
[1] The trial court's purported severance of the two claims did not result in the creation of a new action; rather, it resulted in the ordering of separate trials for the workers' compensation claim and the retaliatory-discharge claim. See Bryant v.Flagstar Enters., Inc., 717 So.2d 400 (Ala.Civ.App. 1998). This action was originally remanded by this court to the trial court as being from a nonfinal judgment. See Rule 54(b), Ala. R. Civ. P., and Schneider Nat'l Carriers, Inc. v. Tinney, 776 So.2d 753
(Ala. 2000). On February 20, 2004, Ruggs moved the trial court to dismiss her retaliatory-discharge claim, and the trial court granted that motion on the same day. Accordingly, the judgment in this case is now final, and this court will proceed to address the issue raised in this case on appeal.
[2] It appears from the record that Masterbrand's workers' compensation insurance carrier initially refused to authorize the recommended surgery and referred Ruggs for a second opinion. Ruggs continued to undergo physical therapy during the intervening time; however, the therapy failed to relieve Ruggs's symptoms. *Page 876