914 So.2d 869 (2005)
STONE & WEBSTER CONSTRUCTION, INC.
v.
Ted L. LANIER.
No. 2021220.
Court of Civil Appeals of Alabama.
March 18, 2005.
Certiorari Denied June 10, 2005.
*870 Dennis Riley of Morring, Schrimsher & Riley, Huntsville, for appellant.
B. Scott Shipman of Sherrill, Batts & Shipman, LLC, Athens, for appellee.
Alabama Supreme Court 1040970.

On Application for Rehearing
PER CURIAM.
This court's opinion of December 17, 2004, is withdrawn and the following is substituted therefor.
Ted L. Lanier sued his employer, Stone & Webster Construction, Inc., on May 29, 2001, seeking to recover workers' compensation benefits for an injury he allegedly sustained to his right knee during the course of his employment with Stone & Webster. Following an ore tenus proceeding, the trial court, on June 27, 2003, entered its judgment finding that Lanier had suffered a cumulative-stress injury to his right knee, that the injury arose out of and in the course of Lanier's employment with Stone & Webster, and that Lanier was rendered permanently and totally disabled as the result of his injury. Stone & Webster appealed following the denial of its postjudgment motion.
This case is governed by the 1992 Workers' Compensation Act, § 25-5-1 et seq., Ala.Code 1975. That act provides that an appellate court's review of the standard of proof and its consideration of other legal issues in a workers' compensation case shall be without a presumption of correctness. § 25-5-81(e)(1), Ala.Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our Supreme Court "has defined the term `substantial evidence,' as it is used in § 12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996), quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). This court has also concluded: "The [1992 Workers' Compensation] Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995).
At the time of trial, Lanier was 64 years old and had a high-school education. Although he had completed a machinist training course, he had no additional college or other technical training. Lanier began working as a carpenter in the construction industry in 1973 and joined the Local 1274 Carpenter's Union in Decatur in 1977. The carpenter's union would refer Lanier to various job sites for employment as a carpenter. He testified that his job requirements as a carpenter required him to constantly crawl, squat, and climb. *871 Before becoming a carpenter, Lanier worked at a bakery and as a switchman or brakeman for a railroad, and he and his wife also operated a "country" store where he "pumped gas" and "fixed tires."
Lanier had been referred by the carpenter's union to Stone & Webster for employment as a carpenter and was working in that capacity on November 13, 2000. Lanier testified that on that date he had been helping to construct scaffolding and had been crawling, squatting, and climbing on the scaffolds. He stated that he left the construction area and started walking to the "break" room when his right knee began "acting awful ... like it had extra stuff under the knee cap." Lanier testified that while he sat in the break room his knee began to get stiff and that when he returned to work his knee "didn't work right" and began "hurting real bad." He reported his injury to Jay Beam, Stone & Webster's safety supervisor.
Lanier requested that Stone & Webster refer him to a physician, but when his request was denied he made an appointment with his personal physician, Dr. Marlin Gill. Lanier was seen by Dr. Gill on November 17, 2000, complaining of right-knee pain. Lanier reported that he did not suffer a specific injury to the knee but that he had had an onset of pain after working on his knees and climbing scaffolding. Lanier further reported feeling a "cracking" and "popping" sensation in the knee. Dr. Gill noted that an X-ray taken of the knee did not indicate any problems except for some slight degenerative changes. Dr. Gill further noted after his physical examination of Lanier's knee that the knee looked normal with no visible swelling or joint effusion, that Lanier had tenderness with pressure over the patella and crepitus with movement, and that the knee had a full range of motion and stable ligaments. Dr. Gill restricted Lanier from kneeling and climbing for two weeks.
Lanier testified that for approximately two weeks after seeing Dr. Gill he primarily sat in the break room with his leg elevated and his knee iced. He stated that when he was able to work he was unable to perform the full duties of a carpenter because he could not climb. Lanier's supervisor allowed him to work as a carpenter foreman, which did not involve as much climbing, crawling, and squatting. However, Lanier began to squat and crawl on certain tasks out of necessity. According to Lanier, however, on February 5, 2001, he was performing a task where "everything [he did he] had to squat or crawl" and that it "really worked on that knee and so it quit working again." Lanier reported this incident to Beam and, on this occasion, Stone & Webster referred Lanier for treatment to Dr. Ray Fambrough.
Lanier was seen by Dr. Fambrough on February 15, 2001. Dr. Fambrough's physical examination indicated that Lanier's right knee was painful and tender over the medial joint line and aspect and that Lanier had some mild pain and crepitus in the patellofemoral joint. Dr. Fambrough's initial impression was that Lanier had a torn medial meniscus in the right knee with mild chondromalacia of the patella. Dr. Fambrough restricted Lanier to modified duty with no climbing, stooping, or bending.
Dr. Fambrough ordered an MRI, the results of which indicated that Lanier had a tear in the apex of the medial meniscus with truncation and a tear in the posterior horn of the medial meniscus. Lanier returned to Dr. Fambrough on March 6, 2001, complaining of increased pain in his knee. Dr. Fambrough noted at that time that Lanier's pain was located over the posterior aspect of the medial meniscus and that Lanier *872 had some mild crepitus and grinding in the patellofemoral joint. Dr. Fambrough recommended arthroscopic surgery and continued Lanier on modified duty. On March 8, 2001, Dr. Fambrough stated in a letter to the case manager of Stone & Webster's workers' compensation insurer that Lanier's knee injury was work related; however, Stone & Webster's workers' compensation insurer refused to approve the surgery recommended by Dr. Fambrough.
Lanier continued to work for Stone & Webster under the restrictions imposed by Dr. Fambrough until he was laid off on April 30, 2001, when the construction project that he was working on was completed. Lanier testified that before being laid off he had decided to work until the completion of the construction project and to then retire from the carpenter's union. Beam testified that Lanier had informed Stone & Webster that he wanted to work until the completion of the project and then retire.
Lanier continued to experience problems with his knee and ultimately sought treatment on January 16, 2002, from Dr. Jack Moore, a physician covered under Lanier's medical insurance. Dr. Moore's physical examination indicated that Lanier had some swelling and tenderness over the medial and lateral joint lines. An X-ray indicated that Lanier had some mild osteoarthritis in the knee. Dr. Moore stated that he suspected a medial meniscal tear and ordered an MRI, the results of which revealed a tear in the posterior horn of the medial meniscus. Dr. Moore recommended arthroscopic surgery, which Lanier underwent on February 28, 2002.
Dr. Moore found during surgery that Lanier had a complex tear of his medial meniscus that was larger than the MRI results had indicated. He stated that the tear was more typical of a traumatic tear than a degenerative tear. Dr. Moore also discovered during surgery that Lanier had significant arthritic changes in his knee.[1] Lanier continued to see Dr. Moore for follow-up treatment after the arthroscopic surgery. Lanier was seen by Dr. Moore on September 5, 2002, complaining of pain in his right knee. Dr. Moore testified that the pain did not seem to be mechanical in nature, as would have been expected with a meniscal tear, but, rather, that it was more joint-line pain consistent with arthritis. Dr. Moore opined that Lanier had reached maximum medical improvement on May 2, 2002.
Dr. Moore testified that Lanier's knee injury was work related and that his work activities of frequently crawling, squatting, kneeling, and climbing had contributed to his injury. He stated that Lanier had a permanent-physical-impairment rating of only three percent to the right lower extremity and a permanent-physical-impairment rating of only one percent to the whole person. On direct examination by counsel for Stone & Webster, Dr. Moore stated that he could not determine whether the arthritic changes in Lanier's knee were posttraumatic changes related to his injury or whether they were caused by routine wear and tear. He testified that he released Lanier with no permanent restrictions.
However, on cross-examination by counsel for Lanier, Dr. Moore testified as follows:
"Q. Would you recommend any restrictions now?

*873 "A. I would say work as tolerated just based on 
"Q. Would you have any specific restrictions on kneeling, squatting, anything like that?
"A. Well, related to his cartilage tear, he should be past that point of restriction. The other finding is somewhat uncertain, what cause of the arthritis. Certainly, he would be at risk for needing to avoid deeper squatting and higher climbing activities, just from that. But as far as his work-related injury, we did not assign any at that point that I know of.
"Q. And let me explore that just a little bit. You said that you did see some arthritic type changes?
"A. Yes.
"Q. And those type changes can be the result of an injury or some sort of trauma; is that true?
"A. Yes, you can have arthritis as posttraumatic, yes.
"....
"Q. But do you have any history of any pain prior to that?
"A. Prior to the injury?
"Q. Yes.
"A. No, I did not have any history of that.
"Q. Assuming that Mr. Lanier had no pain prior to the November of 2000 injury, do you have an opinion, based on a reasonable medical certainty, as to whether his injury aggravated his arthritic condition in his knee? Caused or aggravated, I should say.
"A. Right. I think it would be reasonable to say that it aggravated his underlying condition. Like I said, it's hard to know how much of his arthritis was due to posttraumatic causes or, at 62, how much was preexisting, but certainly, we can say that it aggravated it."
Lanier testified that before his workplace injury he had had no problems with his knee or with arthritis. He testified that since his injury he has had very few days in which he does not experience pain in his knee. He rated his pain as a 3 or 4 on a scale of 10 on days that he does not overexert himself or sits for prolonged periods of time. Lanier stated that his pain increases if he turns quickly or has to negotiate stairs. He demonstrated in court that he has modified the way he climbs steps by stepping with his left leg and then lifting his right leg to place it on the step with his left leg so that he bears his weight on his left leg. He repeats that process for each step.
Lanier testified that he has limited his daily activities, including limiting standing to 5 to 10 minutes at a time and limiting walking to 1 to 2 blocks at a time. He stated that he relies upon the assistance of his grandson to do yard work. He further stated that he takes ibuprofen and elevates his leg in order to help control the pain. Lanier testified that he can no longer perform the duties required of a carpenter.
On cross-examination by counsel for Stone & Webster, Lanier testified as follows:
"Q. Now, before this job actually started, you had formed an intention to retire; is that correct?
"A. That's right.
"Q. So you were going to work this job, and then retire?
"A. That's right.
"Q. Now, do you remember when I took your deposition, I think I asked you, your knee didn't play any part in your decision to retire; did it?
"A. No, not at that time.
"Q. I think you, in response to [counsel for Lanier's] questions, you stated *874 that nobody's come up and offered you a job, but you haven't been looking for a job either; have you?
"....
"A. No.
"Q. Hadn't formed any intention, haven't taken any classes or training or anything to learn some new skills to work as anything other than a carpenter; have you?
"A. No.
"Q. When you formed your intention to retire, that's exactly what you meant to do; wasn't it? You were going to retire. You had worked a long time 
"A. I was going to retire as a carpenter.
"Q. And you were through working; weren't you?
"A. Through working as a carpenter because I couldn't do no carpenter work.
"Q. As a matter of fact though, I think in your deposition, I asked you, `You were aware that Stone & Webster since you retired, has had additional jobs in this area?'
"A. Yes.
"Q. Okay. And I think you told them  told me that, I guess, you would have been eligible for those if you would have continued to work; wouldn't you?
"A. Yes.
"Q. I think you answered, `Yeah, I would have gone in' if you had wanted to; wouldn't you?
"A. If I said that, that's what I said. I don't remember, but you know.
"Q. It's page twenty-seven. I'll read the whole thing. It said, `And Stone & Webster has had other projects since then; haven't they?' And you said, `Yes.' The next question: `And I guess you would have been eligible for those if you would have continued to work?' Your answer was: `Yeah, I would have gone in.'
"A. Yeah, if I had been still working there, I could have went to work, yes, sir.
"Q. But you chose not to?
"A. That's right.
"Q. As a matter of fact, even today you could go back there if you wanted to; couldn't you?
"A. I wouldn't be able to work.
"Q. Well, you could work as a supervisor or foreman; couldn't you?
"A. If they'd  but they don't do a lot of that kind of stuff.
"Q. But you hadn't wanted to go back to work; have you?
"A. Not as a carpenter, no."
The first of several arguments made on appeal by Stone & Webster is that the trial court's finding that Lanier suffered a cumulative-physical-stress injury is not supported by clear and convincing evidence. Section 25-5-51, Ala.Code 1975, provides that for an injury to be compensable it must be "caused by an accident arising out of and in the course of" the employee's employment. More specifically, § 25-5-1(9), Ala.Code 1975, states, in part, that an "[i]njury shall include physical injury caused either by carpal tunnel syndrome disorder or by other cumulative trauma disorder if either disorder arises out of and in the course of the employment." Further, § 25-5-81(c), Ala.Code 1975, provides:
"Evidence. The decision of the court shall be based on a preponderance of the evidence as contained in the record of the hearing, except in cases involving injuries which have resulted from gradual deterioration or cumulative physical stress disorders, which shall be deemed compensable only upon a finding of clear and convincing proof that those injuries *875 arose out of and in the course of the employee's employment.
"For the purposes of this amendatory act, `clear and convincing' shall mean evidence that, when weighted against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
The phrase "in the course of the employee's employment" refers to the time, place, and circumstances under which the accident occurred. Dunlop Tire & Rubber Co. v. Pettus, 623 So.2d 313 (Ala.Civ.App.1993). The phrase "arising out of" an employee's employment requires a causal connection between the injury and the employment. Id. In order to establish causation, Lanier was required to satisfy a two-part causation test by producing substantial evidence establishing both (a) legal causation and (b) medical causation. Ex parte Trinity Indus., Inc., 680 So.2d 262. See also City of Tuscaloosa v. Howard, 55 Ala.App. 701, 318 So.2d 729 (Civ.App.1975).
Stone & Webster does not take issue with the trial court's finding of legal causation, but it argues that Lanier failed to establish medical causation by clear and convincing evidence. Dr. Fambrough indicated in a letter to Stone & Webster's workers' compensation insurance carrier, however, that Lanier's knee injury was work related. Dr. Moore testified that Lanier's knee injury was work related and that his work activities involving frequently crawling, squatting, kneeling, and climbing contributed to his injury. Although Dr. Moore stated that it was difficult to determine how much of Lanier's arthritis was the result of posttraumatic trauma from his injury or how much of it was preexisting, he did state unequivocally that the work-related injury "certainly" aggravated his arthritic condition. Ex parte Trinity Indus., Inc., 680 So.2d at 269. Accordingly, we conclude that Lanier established "medical causation" with evidence that the trial court reasonably could have found to be clear and convincing.
Stone & Webster next argues that the trial court erred in compensating Lanier for an injury to the body as a whole, rather than for having suffered a scheduled injury under § 25-5-57(a)(3), Ala. Code 1975. The proper application of § 25-5-57(a)(3) was addressed by our Supreme Court in Ex parte Drummond Co., 837 So.2d 831 (Ala.2002), in which, among other things, the Court noted:
"In Bell v. Driskill, 282 Ala. 640, 213 So.2d 806 (1968), this Court established an exception that removes certain injuries from the workers' compensation schedule. This Court held in Bell:

"`[A]lthough the injury itself is to only one part or member of the body, if the effect of such injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under the [Workers'] Compensation Law to the amount allowed under the schedule for injury to the one member.'"
837 So.2d at 833. The Court then renewed its "commitment to the policy that underlay the Bell test." 837 So.2d at 834. Quoting 4 Lex K. Larson, Larson's Workers' *876 Compensation Law § 87.02 (2001), the Supreme Court concluded:
"`The great majority of modern decisions agree that, if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'
"(Footnote omitted.) This language remains unchanged from the edition of the Larson treatise on which this Court relied in Bell. Because of the confusion that has developed surrounding the Bell test, we today adopt the language recited above from Larson, Workers' Compensation Law § 87.02, as the test for determining whether an injury to a scheduled member should be treated as unscheduled."
Drummond Co., 837 So.2d at 834-35 (footnote omitted). See also Wal-Mart Stores, Inc. v. Gardner, 885 So.2d 168 (Ala.Civ. App.2003).
As mentioned above, Lanier testified that he has modified the way in which he negotiates steps by stepping with his left leg and bearing all of his weight on it while lifting his right leg. Lanier also testified as follows:
"Q. All right. Tell me that again, explain that again? What's wrong with you, any other part of your body?
"A. Well, my left knee hurts because I have to use it more on account of my right knee. I can't bend it right. I can't put no pressure, like to squat down, I can't squat down with my right knee. I squat down on my left knee, but when I do that, I've hurt it now. And it hurts a whole lot like my right knee in the same, you know, places. So it may be having the same thing wrong with it, I don't know."
We also note that the record indicates that the trial court was able to observe Lanier step and walk in open court.
Based on our review of the record in this case, we agree with Stone & Webster that the evidence is not sufficient to establish a permanent and total disability on the part of Lanier and that the standard required in order to remove Lanier's injuries from the schedule imposed by § 25-5-57(a)(3), as described in Ex parte Drummond Co., has not been met. Section 25-5-57(a) provides, among other things:
"(3) Permanent partial disability.
"a. Amount and Duration of Compensation. For permanent partial disability, the compensation shall be based upon the extent of the disability. In cases included in the following schedule, the compensation shall be 66 2/3 percent of the average weekly earnings, during the number of weeks set out in the following schedule:
"....
"16. For the loss of a leg, 200 weeks.
"....
"26. For the loss of two legs, 400 weeks."
Section 25-5-57(a)(3)d., Ala.Code 1975, states:
"Loss of Use of Member. The permanent and total loss of the use of a member shall be considered as equivalent to the loss of that member, but in such cases the compensation specified in the schedule for such injury shall be in lieu of all other compensation, except as otherwise provided herein. For permanent disability due to injury to a member resulting in less than total loss of use of the member not otherwise compensated in this schedule, compensation shall be paid at the prescribed rate during that part of the time specified in the schedule for the total loss or total loss of use of *877 the respective member which the extent of the injury to the member bears to its total loss."
Lanier argues that to limit his recovery only to compensation allowed under § 25-5-57(a)(3) would be contrary to this court's opinion in Masterbrand Cabinets, Inc. v. Ruggs, 891 So.2d 869 (Ala.Civ.App.2004). In Ruggs, we concluded that "the trial court did not err in treating [the employee's] left hand and wrist injury as an injury to the body as a whole." 891 So.2d at 875. Arguably, Ruggs can be distinguished on its facts from the present case. The trial court in Ruggs could have, and evidently did, believe the employee's testimony that she "experiences swelling and constant pain in her left wrist and hand, which she rates at a 4 to 6 on a scale of 10.... She testified that she elevates and massages her arm approximately three to four hours per day in an attempt to relieve the pain and swelling. She further testified that she uses an electrical-stimulation unit on her arm approximately two and one-half hours per day.... She further stated that the constant pain has caused her to become withdrawn and irritable." Ruggs, 891 So.2d at 873. The trial court found that "[the employee] `experiences constant pain on a moderate to moderately severe level.'" Ruggs, 891 So.2d at 873. In Ex parte Drummond Co., the holding necessary for the case before the court was that the scheduled allowance for a lost member is not exclusive "`"if the effects of the loss of the member extend to other parts of the body and interfere with their efficiency."'" 837 So.2d at 833 (quoting Bell v. Driskill, 282 Ala. 640, 645, 213 So.2d 806, 810 (1968)). This holding was premised upon the Supreme Court's renewed "commitment to the policy that underlay the Bell test," 837 So.2d at 834, which in its entirety read as follows:
"`[I]f the effect of [an] injury extends to other parts of the body, and produces a greater or more prolonged incapacity than that which naturally results from the specific injury, or the injury causes an abnormal and unusual incapacity with respect to the member, then the employee is not limited in his recovery under the [Workers'] Compensation Law to the amount allowed under the schedule for injury to the one member.'"
Ex parte Drummond Co., 837 So.2d at 833 (quoting Bell, 282 Ala. at 646, 213 So.2d at 811).
Despite this potential distinction, our opinion in Ruggs did not focus on the employee's pain or consider the severity and constancy of that pain as "an abnormal and unusual incapacity" associated with the injury to the employee's left upper extremity. Instead, we concluded that the employee "presented substantial evidence indicating that the effect of the injury to her left hand and wrist extended to her right upper extremity because of the resulting overuse of her right upper extremity" and that the employee was thereby "hinder[ed] [in] her ability to use her right upper extremity." Ruggs, 891 So.2d at 875. It was on this ground that we held that the trial court did not err in treating the employee's left upper extremity injury as an injury to the body as a whole. Ruggs, 891 So.2d at 875.
As noted above, the loss of use of a member is equivalent to the loss of that member. See § 25-5-57(a)(3)d. Further, § 25-5-57(a)(3)a.24. schedules a compensation allowance for the loss of both arms and § 25-5-57(a)(3)a.25. schedules a compensation allowance for the loss of both hands, just as § 25-5-57(a)(3)a.26. schedules a compensation allowance for the loss of both legs. See also § 25-5-57(a)(3)a.15., Ala.Code 1975. To the extent Ruggs conflicts with our holding in the present case, we conclude it must be *878 overruled if we are to follow, as we must, the renewed emphasis announced by the Supreme Court in Ex parte Drummond Co. on adherence to the scheduled compensation allowances prescribed in § 25-5-57(a)(3).
We reverse the trial court's finding of permanent and total disability. On remand, the trial court is instructed to determine the degree of Lanier's permanent partial disability applying the standard articulated in Ex parte Drummond Co.
Stone & Webster also argues that the trial court erred in awarding Lanier temporary-partial-disability benefits during the period from April 30, 2001, when Lanier's employment with Stone & Webster ended, until May 2, 2002, when Lanier reached maximum medical improvement.[2] Stone & Webster contends that this award of temporary-partial-disability benefits was in error because, before his accident, Lanier had anticipated retiring at the end of his employment with Stone & Webster.[3] Stone & Webster provides us with no legal authority for this proposition, and, therefore, we affirm the trial court's judgment in this regard. See Rule 28(a)(10), Ala. R.App. P.
In light of our disposition of the foregoing issues, including particularly our remand of the cause for the trial court to make an award of permanent-partial-disability benefits to Lanier as discussed above, we need not address the other issues raised by Stone & Webster.
OPINION OF DECEMBER 17, 2004, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON, MURDOCK, and BRYAN, JJ., concur.
PITTMAN, J., concurs specially, with writing, which CRAWLEY, P.J., joins.
PITTMAN, Judge, concurring specially.
I concur in the main opinion on rehearing. Although Masterbrand Cabinets, Inc. v. Ruggs, 891 So.2d 869 (Ala.Civ.App.2004), involved the effects of injuries of one hand and wrist that extended to an injured employee's other "upper extremity," a term not specifically used in the schedule of injuries set forth in § 25-5-57(a)(3), Ala. Code 1975, an "extremity" is, in simple English, "a limb of the body; [especially] a human hand or foot." Merriam-Webster's Collegiate Dictionary 445 (11th ed.2003). The mere use of another term for "upper arm" should not be sufficient, under Ex parte Drummond Co., 837 So.2d 831 (Ala. 2002), to warrant a court's departure from the schedule of discrete injuries adopted by our Legislature. I therefore agree that *879 Ruggs must be overruled if we are to adhere to the Workers' Compensation Act and the interpretation given that Act by our Supreme Court, as we must.
CRAWLEY, P.J., concurs.
NOTES
[1] The record indicates that Lanier was diagnosed with "gouty" arthritis in 1995; however, nothing in the record indicates whether the "gouty" arthritis diagnosed in 1995 is related to the arthritic changes that Dr. Moore found in Lanier's knee during surgery.
[2] We note that Lanier underwent surgery on his right knee during this period and that a vocational expert testified to an 83 to 87 percent loss of earning capacity during the period between Lanier's injury and the time he reached maximum medical improvement. The trial court noted in its judgment that in an achievement test administered by Anne Darnell, a rehabilitation counselor, Lanier scored at the fifth-grade level for reading, at the third-grade level for spelling, and on a high-school level for arithmetic. Lanier points to this evidence, and cites Gold Kist, Inc. v. Casey, 495 So.2d 1129 (Ala.Civ.App. 1986), overruled on other grounds, Ex parte Drummond Co., 837 So.2d 831 (Ala.2002), to contend that the trial court properly disregarded the prospect that Stone & Webster might have provided Lanier with what Lanier says would have been "sheltered" employment following April 30, 2001.
[3] The trial court's finding with respect to Lanier's decision to retire before being laid off by Stone & Webster is stated as follows: "Mr. Lanier had made a decision to retire as a carpenter before he was laid off." (Emphasis in original.)