These parties have previously been before this court. See Drummond Co.v. Key, 819 So.2d 57 (Ala.Civ.App. 2001) ("Drummond I").
Jerry R. Key sued his employer, Drummond Company, Inc., on November 21, 1995, seeking to recover workers' compensation benefits for injuries he sustained to his back in March 1994 and to his right knee in June 1995, as the result of accidents that occurred during the course of his employment with Drummond. Following an ore tenus proceeding, the trial court, on November 1, 2000, entered an order finding that Key had suffered injuries to his back and knee during the course of his employment with Drummond and had sustained a permanent partial disability of 35% as a result of his injuries. The trial court awarded benefits accordingly.
Drummond appealed the trial court's judgment to this court, arguing, among other things, that the trial court had erred in failing to treat Key's knee injury as an injury to a scheduled member. This court stated: "[We] cannot discern from the trial court's order whether it treated the knee injury as an injury to a scheduled member or whether it concluded that the knee injury fell outside the scope of the scheduled member provisions pursuant to Bell[v. Driskill, 282 Ala. 640, 213 So.2d 806
(1968)]." Drummond I, 819 So.2d at 58. This court reversed the trial court's judgment and remanded the case for the trial court to make a finding as to whether the injury to Key's knee falls outside the scheduled member provision of § 25-5-57(a)(3)a., Ala. Code 1975. Id.
On remand, the trial court amended its judgment and found that Key's knee injury extended beyond the knee itself, aggravating his spine and back causing new and additional pain and limitation to his back. The trial court again found that the back injury and the knee injury combined to render Key 35% permanently and partially disabled. Drummond appeals.
This case is governed by the 1992 Workers' Compensation Act. This Act provides that an appellate court's review of the standard of proof and its consideration of other legal issues shall be without a presumption of correctness. § 25-5-81(e)(1), Ala. Code 1975. It further provides that when an appellate court reviews a trial court's findings of fact, those findings will not be reversed if they are supported by substantial evidence. § 25-5-81(e)(2). Our supreme court "has defined *Page 1161 
the term `substantial evidence,' as it is used in § 12-21-12(d), to mean `evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" Ex parte Trinity Indus., Inc., 680 So.2d 262,268 (Ala. 1996), quoting West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989). This court has also concluded: "The new Act did not alter the rule that this court does not weigh the evidence before the trial court." Edwards v. Jesse Stutts, Inc., 655 So.2d 1012,1014 (Ala.Civ.App. 1995).
Key was 55 years old at the time of the trial. He has a bachelor of science degree in chemistry and biology from the University of North Alabama and a master's degree in secondary education and administration, also from the University of North Alabama. He was employed as a teacher and coach from 1969 until 1975.
Key was employed by Alabama By-Products Corporation as a coal miner in 1975 and promoted to a management position in 1978.[1] Key was employed by Drummond as a supervisor at its Shoal Creek mine at the time of the injuries. The parties stipulated that Key earned $1,069.77 per week. Key testified that in March 1994 he was walking down a steep incline in the Shoal Creek mine; the incline was wet and muddy and he slipped and fell. He began experiencing pain in his lower back and eventually sought treatment from Dr. Robert Q. Craddock, a neurosurgeon.
Key was first seen by Dr. Craddock on April 12, 1994, complaining of severe back and right leg pain with numbness in his right foot. Dr. Craddock performed tests and diagnosed Key with a herniated disc at the L4-L5 level on the right side. Dr. Craddock performed surgery on Key on April 21, 1994, to repair the herniated disc. Dr. Craddock determined that Key had reached maximum medical improvement on June 28, 1994, and he released him to return to his full and usual duties with Drummond. Dr. Craddock testified that he did not assign Key any restrictions or limitations and did not prescribe him any pain medication. He stated that Key had no real complaints at that time and that he was normal neurologically. Dr. Craddock assigned Key a permanent partial physical impairment rating of 10% because of the injury and subsequent surgery.
Key returned to his normal duties as a supervisor with Drummond, earning the same salary as he did before he sustained the back injury. Key testified that in June 1995 he was again walking down a steep incline in the Shoal Creek mine that was wet and muddy. He stated that as he was walking he slipped and fell and twisted his right knee. Key testified that he experienced immediate pain in his knee. He sought treatment for his knee injury from Dr. Erich W. Wouters on June 9, 1995. Dr. Wouters noted that Key had tenderness, swelling, and a limited range of motion in his knee. Dr. Wouters ultimately performed arthroscopic surgery on Key's knee on July 6, 1995. Dr. Wouters testified that Key had primarily arthritic problems with his knee as well as several pieces of loose cartilage in the knee and that the surgery was, in effect, a "kind of tune up, . . . cleaning out the arthritic damage." Dr. Wouters determined that on July 28, 1995, Key had reached maximum medical improvement and returned him to work at full duties with no limitations or restrictions. Dr. Wouters noted at the time that Key had a painless range of motion in the knee with no complaints. Dr. Wouters assigned Key a 0% permanent *Page 1162 
partial physical impairment rating. Key has not returned to Dr. Wouters for further treatment of the knee.
Following his release from Dr. Wouters, Key returned to his normal duties at Drummond as a supervisor, earning the same salary he earned before the knee injury. Key was terminated from his employment with Drummond on August 15, 1995, for reasons unrelated to his work-related injuries.
Approximately two weeks after being terminated by Drummond, Key was employed by a Wal-Mart store in its automotive department earning approximately $6.00 per hour. During the application process, Key represented that he could lift, move objects, bend, twist, squat, and reach to work above the shoulders and below the waist with no limitations. Key worked at Wal-Mart for approximately eight months.
Key was next employed by Gold Kist Hatchery on June 10, 1996, earning approximately $6.35 per hour. During the application process, Key represented that he had no restrictions or problems with regard to his back, knees, and legs; bending; climbing; sitting; squatting; standing; or walking. Key further represented that he had no condition requiring work restrictions or special assignments. While employed at Gold Kist, Key worked in the position of "transfer operator." His job duties required him to lift over 100 trays of eggs per day; each tray weighed 25 to 30 pounds. The range of the lifting motion was from the waist and above and required some bending and stooping. Key was employed with Gold Kist for approximately two years.
In August 1996, while he was employed with Gold Kist and one year after being terminated by Drummond, Key returned to Dr. Craddock complaining of neck, back, and leg pain. Diagnostic testing revealed a small herniated disc at the L3-L4 level. Dr. Craddock determined that this was a "new" injury and treated Key conservatively with cortisone epidural injections. Dr. Craddock testified that at that time he imposed on Key a 30-pound lifting restriction and restrictions from repetitive bending or stooping because of the new disc injury.
Key was next employed by the Alabama Thrift Store in June 1998. During the application process, Key passed a physical examination and was cleared to work without restrictions. He was employed as a loading dock supervisor, production supervisor, and assistant store manager. He earned approximately $560 biweekly. Key voluntarily left his employment with the thrift store in October 1999 to become a minister. He testified that he earned $375 per week as a minister.
Key testified that after he returned to work at Drummond following the back surgery in 1994, he could perform his job duties but that he "had to be careful." He stated that he noticed that his back was weaker and that he could not "do the walking like [he] used to." He also stated that his legs were "weaker." Key testified that he had lost some strength in his right leg after the knee surgery in 1995. He stated that he experiences pain in the leg when he puts stress and pressure on it, and that he has trouble walking or climbing inclines and steps.
Key testified that he experiences pain in his back everyday and that he takes pain medication. He stated that he experiences problems getting in and out of his vehicle and that he cannot ride in a vehicle for more than 45 minutes at a time. He testified that he has limited stooping and squatting ability. Key stated that before the injuries he would play golf and fish but that after the injuries he does so less frequently because of the pain. He further *Page 1163 
stated that he is limited in the amount of yard work that he is able to do. When asked why he did not return to teaching, Key stated that he considered it, but that it would take him one year to become recertified to teach and that he decided not to because of the expense involved. He further testified that he could not return to heavy physical work.
On cross-examination, Key testified that after his back surgery in 1994, he was "verbally told" by Dr. Craddock that he had a lifting restriction of 15 to 20 pounds. He stated that Dr. Wouters returned him to work after the knee surgery with no restrictions.
Drummond argues on appeal that the trial court erred in determining that Key's injuries had resulted in a 35% permanent partial disability, because, it says, Key returned to his employment after each injury and earned the same salary; therefore, it argues, he suffered no loss of earning capacity. It is the duty of the trial court to review all of the evidence, including its own observations, in determining the extent of the disability. M.C. Dixon Lumber Co. v. Phillips, 642 So.2d 477
(Ala.Civ.App. 1994). The determination regarding the extent of disability is a matter within the discretion of the trial court and will not be disturbed on appeal if the evidence supports that determination. Id.
Section 25-5-57(a)(3)i., Ala. Code 1975, governs the award of permanent partial disability benefits when an employee returns to work at a wage equal to or greater than the wage he was earning at the time of the injury. Section 25-5-57(a)(3)i., Ala. Code 1975, provides in part:
 "If . . . an injured worker returns to work at a wage equal to or greater than the worker's pre-injury wage, the worker's permanent partial disability rating shall be equal to his or her physical impairment and the court shall not consider any evidence of vocational disability."
The measure of compensation for a permanent partial disability is loss of earning capacity. Brown v. Champion Int'l Corp., 693 So.2d 24
(Ala.Civ.App. 1996). When an employee's post-injury wages are the same or higher than his preinjury wages, a presumption arises that no loss of earning capacity has occurred. Id. This court has stated:
 "`"[T]he presumption may be rebutted by evidence independently showing incapacity or explaining away the post-injury earnings as an unreliable basis for estimating capacity. Unreliability of post-injury earnings may be due to a number of things; increase in general wage levels since the time of the accident; claimant's own greater maturity or training; longer hours worked by claimant after the accident; payment of wages disproportionate to capacity out of sympathy to claimant; and the temporary and unpredictable character of post-injury earnings."'
 "Jim Walter Resources, Inc. v. Hall, 516 So.2d 690, 691 (Ala.Civ.App. 1987) (quoting 2 A. Larson, The Law of Workmen's Compensation § 57.21(d) (1987))."
Brown, 693 So.2d at 27.
After carefully reviewing the record, we conclude that the trial court abused its discretion in determining that Key had suffered a 35% permanent partial disability as a result of his work-related injuries. After Key's back surgery in 1994, he returned to his normal duties with Drummond, earning the same wage he earned before his injury. Although Key stated that Dr. Craddock "verbally told" him that he had a lifting restriction of 15 to 20 pounds, Dr. Craddock testified that he returned Key to work at full duty with no *Page 1164 
limitations or restrictions and that he prescribed no pain medication. Dr. Craddock stated that on the day he released Key to return to work, Key had no complaints and was normal neurologically. Dr. Craddock did assign Key a medical impairment rating of 10%. Key did not return to Dr. Craddock with any further complaints regarding his back that were related to the 1994 injury and surgery. Key was able to perform all the duties required of his job when he returned to his employment at Drummond. He stated only that his back and legs were weaker; that he could not do the same amount of walking; and that he had to be careful while working.
After Key's knee injury and surgery in 1995, he again returned to his normal duties at Drummond earning the same wage he earned before his injury. Dr. Wouters released Key to full duty with no limitations or restrictions and assigned him a 0% impairment rating. The knee injury and surgery did not prevent Key from performing his job duties; however, he did state that he had lost some leg strength after the surgery; that he experiences pain when he puts stress on the knee; and that he has trouble climbing inclines and stairs. He did not return to Dr. Wouters with complaints regarding his knee.
After Key was terminated from his employment with Drummond he was able to obtain other employment within a matter of weeks. His wages earned from this and subsequent jobs were significantly less than the wage earned at Drummond; however, nothing in the record indicates that Key's reduction in earnings was caused by the work-related injuries suffered while he was employed at Drummond. In fact, Key represented on different occasions that he could work without any limitations or restrictions regarding his knee and back and that he was not limited with regard to lifting, bending, stooping, twisting, and squatting. Accordingly, we conclude that the trial court's determination that Key had suffered a 35% permanent partial disability is not supported by the evidence.
Drummond also argues that the trial court abused its discretion in treating the knee injury as an injury to the body as a whole rather than as an injury to a scheduled member. Our supreme court, in Bell v.Driskill, 282 Ala. 640, 213 So.2d 806 (1968), set forth the test for determining when an injury should be treated as an injury to the body as a whole rather than as an injury to a scheduled member. Recently, our supreme court, in Ex parte Drummond Co., 837 So.2d 831 (Ala. 2002), overruled Bell and its progeny, and restated the test for determining whether an injury to a scheduled member should be treated as an injury to the body as a whole. In overruling Bell, our supreme court stated:
 "[T]he Bell test permitted an injury to a scheduled member to be compensated outside the schedule if the effect of the injury extends to other parts of the body and produces a greater or more prolonged incapacity than that which naturally results from the injury to the specific member. However, the Court of Civil Appeals has substantially expanded the Bell test to include, as effects that will take the injury outside the schedule: (1) pain, swelling, and discoloration; (2) work restrictions; (3) impairment ratings to the body as a whole; and (4) vocational disabilities. It also appears that the Court of Civil Appeals has considered the worker's ability to find future employment as a factor in deciding whether an injury to a scheduled member should be compensated outside the schedule."
Ex parte Drummond, 837 So.2d at 834 (footnotes omitted). The supreme court *Page 1165 
restated the test for determining whether an injury to a scheduled member should be treated as unscheduled as follows: "`[I]f the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'" 837 So.2d, at 833, quoting 4 Lex K. Larson, Larson'sWorkers' Compensation Law § 87.02 (2001).
Dr. Wouters described the surgery he performed on Key's knee as a "tune-up," and he returned Key to work at full duty with no limitations or restrictions. The evidence indicates that Key was able to perform his duties at Drummond and at his subsequent places of employment without complaint and without seeking further treatment from Dr. Wouters for his knee. Key testified that he experiences pain when he places stress on his knee and that he has trouble climbing steps and inclines. This, however, is insufficient to take the knee outside of the schedule and treat it as an injury to the body as a whole under Ex parte Drummond Co. Accordingly, we conclude that the trial court erred in determining that Key's knee injury was an injury to the body as a whole rather than as an injury to a schedule member.
The judgment of the trial court is reversed and the case is remanded for the court to enter an order consistent with this opinion.
REVERSED AND REMANDED.
Crawley, Thompson, and Pittman, JJ., concur.
Murdock, J., concurs in the result.
[1] Alabama By-Products was later purchased by Drummond.