Gulf States Paper Corporation ("the employer") appeals from a judgment awarding Randy Lee Warren ("the employee") workers' compensation benefits for a permanent partial disability resulting from what, the trial court determined, was a nonscheduled injury to the employee's left hand. Because we hold that the trial court erred in treating the injury as nonscheduled, we reverse and remand.
On August 10, 2000, the employee was performing general clean-up duties in the sawmill area of the employer's Moundville facility when he noticed a vine lodged in the conveyor belt of a debarking machine. When the employee attempted to clear the vine, he caught his left hand in the conveyor belt. He was transported by ambulance to the Druid City Hospital emergency room where Dr. John Menard, a plastic surgeon, diagnosed him with a crush injury, burns, and skin loss on the left hand. The employee was hospitalized for three days for nonsurgical wound care and was subsequently released. He was rehospitalized when the wound became infected within a week of his release. On two other occasions, the employee was hospitalized when Dr. Menard performed surgical debridement and skin grafts on the left hand.
On November 13, 2000, the employee returned to work on light-duty status; he was returned to full duty a month later. On February 19, 2001, Dr. Menard, noting that the employee had an unsightly scar but suffered no functional deficits to his hand, determined that the employee had reached maximum medical improvement ("MMI") for the crush injury to his left hand.
In April 2001, the employee returned to Dr. Menard complaining of pain and numbness in his left wrist. Dr. Menard thought those symptoms might indicate carpal tunnel syndrome, so he referred the *Page 100 
employee to Dr. James T. Barnett, an orthopedic surgeon, who performed nerve-conduction-velocity tests on both of the employee's hands on May 7, 2001. After reviewing those test results, Dr. Menard and Dr. Barnett concluded that the employee suffered from bilateral carpal tunnel syndrome. On May 21, 2001, the employee first complained to Dr. Menard of pain in both wrists. He repeated those complaints on July 2 and August 13, 2001. On August 21, 2001, Dr. Menard performed a carpal tunnel release on the employee's left hand. On October 3, 2001, Dr. Menard returned the employee to work at full duty with no restrictions. The employee did not undergo a carpal tunnel release on his right hand.
When asked whether the carpal tunnel syndrome in the employee's left hand was "related to work," Dr. Menard answered, "I think that it certainly could be associated with it, but it could be associated with various other causes of carpal tunnel syndrome. But I certainly have seen carpal tunnel syndrome arise after hand injuries." Dr. Menard added, however, that the employee had no permanent impairment as a result of his carpal tunnel syndrome.
Between November 1, 2001, and March 23, 2004, the employee took an approved leave of absence from his employment to serve on active duty as a member of the Alabama National Guard. On February 15, 2003, as part of his National Guard duties, the employee was loading tents into the back of a truck when, he said, his left hand "gave out, as it always does when [he is] carrying something for a long period of time," and the tents fell on his hands. The employee's National Guard unit was eventually deployed to Iraq, but the employee did not go because, in December 2003, he was honorably discharged from the National Guard for medical reasons due to his bilateral hand problems.
In December 2003, the employee returned to Dr. Menard complaining of decreased sensitivity in the third and fourth fingers of his left hand. Dr. Menard referred the employee to Industrial Services Rehabilitation of Tuscaloosa to determine an impairment rating. As a result of that referral, Dr. Menard concluded that the employee had sustained a 7% impairment to the whole body and a 12% impairment to the left upper extremity due to the employee's August 10, 2000, on-the-job injury.
When the employee returned to work on March 23, 2004, he was assigned the same duties that he had been performing before the crush injury to his left hand. The employee testified at trial that, when he returned to work, his left hand hurt and had "no strength," so he tried not to use it. Instead, he said, he used his right hand more and that that hand began to cause him a great deal of pain. The employee testified that his right hand "hurt so bad that [he could] hardly lift or pull or do anything that [he needed] to do in order to complete [his] job cycles."
Scottie Nolan, the employer's sawmill superintendent, testified that after the employee returned to work in March 2004 he complained that both of his hands were hurting and that he had told Nolan that he had injured his right hand loading military tents. Carla Brown, the employer's human-resources director, testified that, after the employee returned to work from his National Guard duty, he applied for sickness and accident benefits three times — on January 5, January 19, and February 9, 2005. Brown explained that sickness and accident benefits are given for employees' nonwork-related injuries. With each application, Brown specifically asked the employee for which hand he was seeking benefits, and, each time, the employee answered his "right hand," stating *Page 101 
that the injury to that hand was not work-related but had occurred while he was on active duty with the military.
In February 2005, the employee consulted Dr. John P. Buckley, an orthopedic surgeon, about pain, swelling, tenderness, and limited motion in his right hand. Dr. Buckley testified by deposition that the employee did not relate the problems with his right hand to his on-the-job injury in August 2000 but instead to "an accident that he had in February of 2003 while working for the National Guard." Dr. Buckley ordered an MRI and a bone scan of the employee's right wrist. After reviewing the MRI, Dr. Buckley made the following findings:
 "[T]here was a bony connection between the lunate and the triquetrum. This is a congenital variation and probably has no clinical significance. There was some marrow edema, which is a very non-specific finding, involving the scaphoid, which is also one of the bones in the wrist, and the distal radius. It was felt possibly to be related to a specific injury but it was felt also possibly to be related to chronic stress related to some degenerative changes, and there was more clearly on the MRI some marginal osteophyte formation consistent with early degenerative changes. So I think that the overall impression of this was there was some mild osteoarthritis involving the wrist. . . ."
Dr. Buckley testified that the bone scan indicated "trabecular microfracturing or chronic stress reaction." Dr. Buckley put a cast on the employee's right wrist, but when immobilization did not produce marked improvement he gave the employee steroid injections in his right wrist and ordered a functional capacities evaluation ("FCE") for the employee. The FCE, which was conducted on April 18, 2005, indicated that the employee could perform all light-category and some medium-category jobs. Dr. Buckley testified that he could state with a reasonable degree of medical certainty that the condition of the employee's right hand was not related to his August 10, 2000, on-the-job injury.
The employee testified that he continued to work with pain in both hands for almost a year after March 2004 but that he finally quit work on February 7, 2005. Since that time, he has been unemployed and has not applied for any other jobs. He stated that he is in pain every day and that he can no longer do the things he needs to do at home, such as mowing his grass. At the time of trial, the employee was 45 years old. He is a high-school graduate whose prior work history includes working as a stock clerk in a grocery store, as a county jailer, and as a route manager for a rental company. Before his medical discharge in 2003, he had spent 19 years as a member of a military police unit in the Alabama National Guard.
Dr. Donald W. Blanton, a licensed professional counselor who testified as the employee's vocational expert, administered various psychological, I.Q., and achievement tests to the employee and reviewed the employee's medical records, as well as the depositions of Dr. Menard and Dr. Buckley. Dr. Blanton stated that the employee had a full-scale I.Q. of 70, which, he said, placed the employee in the borderline range of intelligence and would make retraining him difficult. Dr. Blanton testified that, in his opinion, the employee suffered from a pain disorder and moderate depression and was permanently and totally disabled.
The trial court's judgment contains the following findings of fact and conclusions of law:
 "The Court finds that the [employee] developed bilateral carpal tunnel syndrome *Page 102 
in the line and scope of his employment. . . .
 ". . . .
 "It is the duty of the Court to determine whether [the employee's] injury is nonscheduled or scheduled within the meaning of the Alabama Workers' Compensation Act. This Court applied the law as found in Ex parte Drummond [Co.], 837 So.2d 831 (Ala. 2002), and its progeny. The Court found that there was sufficient evidence . . . that [the employee's] injury has affected his body as a whole. In making these determinations, the Court has considered all evidence including the Court's personal observations and interpretations of the evidence presented.
 "Based thereon, it is the conclusion and finding of the Court that [the employee] suffers from a nonscheduled permanent partial disability within the meaning of the Alabama Workers' Compensation Act and awards him benefits accordingly."
 Standard of Review
"In reviewing the standard of proof . . . and other legal issues, review by the Court of Civil Appeals shall be without a presumption of correctness." § 25-5-81(e)(1), Ala. Code 1975. "In reviewing pure findings of fact, the finding of the circuit court shall not be reversed if that finding is supported by substantial evidence." § 25-5-81 (e)(2), Ala. Code 1975. "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life AssuranceCo. of Florida, 547 So.2d 870, 871 (Ala. 1989). Therefore, this court "will not reverse the trial court's finding of fact if that finding is supported by substantial evidence." Exparte Trinity Indus., Inc., 680 So.2d 262, 268-69 (Ala. 1996).
 I.
Section 25-5-57(a)(3)a., Ala. Code 1975, provides, in part:
 "a. Amount and Duration of Compensation. For permanent partial disability, the compensation shall be based upon the extent of the disability. In cases included in the following schedule, the compensation shall be 66% percent of the average weekly earnings, during the number of weeks set out in the following schedule:
 ". . . .
 "12. For the loss of a hand, 170 weeks.
 ". . . .
 "25. For the loss of two hands, 400 weeks."
Section 25-5-57(a)(3)d. provides:
 "d. Loss of Use of Member. The permanent and total loss of the use of a member shall be considered as equivalent to the loss of that member, but in such cases the compensation specified in the schedule for such injury shall be in lieu of all other compensation, except as otherwise provided herein. For permanent disability due to injury to a member resulting in less than total loss of use of the member not otherwise compensated in this schedule, compensation shall be paid at the prescribed rate during that part of the time specified in the schedule for the total loss or total loss of use of the respective member which the extent of the injury to the member bears to its total loss."
Section 25-5-57(a)(3)g. provides, in pertinent part:
 "For all other permanent partial disabilities not above enumerated, the compensation shall be 66% percent of the *Page 103 
difference between the average weekly earnings of the worker at the time of the injury and the average weekly earnings he or she is able to earn in his or her partially disabled condition. . . ."
The trial court erred by awarding benefits pursuant to § 25-5-57(a)(3)g., rather than pursuant to § 25-5-57(a)(3)a.12, because it was not presented with substantial evidence indicating that the employee's left-hand injury should have been compensated outside the schedule. Although the trial court's judgment states that it "applied the law as found in Ex parte Drummond [Co.], 837 So.2d 831
(Ala. 2002), and its progeny," we conclude that the trial court failed to follow Drummond and the decisions interpreting it.
In Drummond, our supreme court clarified the proper test for determining whether an injury to a scheduled member should be compensated outside the schedule. The court overruledBell v. Driskill, 282 Ala. 640, 213 So.2d 806 (1968), to the extent that Bell provided two alternatives for taking an injury to a scheduled member outside the schedule, and it approved only the first prong of the Bell
formulation, which was based on the following test:
 "`[I]f the effects of the loss of the member extend to other parts of the body and interfere with their efficiency, the schedule allowance for the lost member is not exclusive.'"
837 So.2d at 834 (quoting 4 Lex K. Larson, Larson'sWorkers' Compensation Law § 87.02 (2001)).
None of the employee's medical providers testified that the effects of the employee's left-hand injury on August 10, 2000, extended to his right hand or to any other part of his body. Although the employee testified that the injury to his right hand occurred because of his overcompensating for the loss of use of his left hand, that rationale for departing from the schedule is invalid. See, e.g., Stone WebsterConstr., Inc. v. Lanier, 914 So.2d 869, 877-78
(Ala.Civ.App. 2005) (holding that worker's compensating for pain in his right knee by dependence upon his left knee was insufficient to remove the right-knee injury from the schedule; overruling Masterbrand Cabinets, Inc. v. Ruggs,891 So.2d 869 (Ala.Civ.App. 2004), which had held that when the effect of a left-hand injury extended to the right hand because of the worker's overuse of the right hand, the left-hand injury should be treated as non-scheduled).
Moreover, a court is bound by the scheduled compensation in § 25-5-57(a)(3), even when the effect of an injury to one scheduled member extends to another scheduled member. SeeGeneral Elec. Co. v. Baggett, [Ms. 2050469, May 11, 2007] ___ So.2d ___, ___ (Ala.Civ.App. 2007) (stating that "any effects of the injury to Baggett's left knee that may have extended to his right knee would not remove his injury from the schedule because the `loss' of two legs is itself a scheduled injury [pursuant to] § 25-5-57(a)(3)a.26"); AlabamaWorkmen's Comp. Self-Insurers Guar. Ass'n v. Wilson, [Ms. 2040523, June 16, 2006] ___ So.2d ___, ___ (Ala.Civ.App. 2006) (stating that "[a]ny interference with the function of both of the employee's arms is of no legal import given that a loss of both arms is itself a scheduled injury"); MasterbrandCabinets, Inc. v. Johnson, [Ms. 2030409, June 3, 2005] ___ So.2d ___, ___ (Ala.Civ.App. 2005) (stating that Ruggs
was overruled because the analysis in that case "had focused on the fact that the worker's pain had spread to another part of her body when, in point of fact, that other part of her body was itself a scheduled member"); and Stone WebsterConstr., Inc. v. Lanier, 914 So.2d at 876-78 (noting that the schedule contains *Page 104 
an entry for the loss of both legs and holding that when the effects of an injury to the right knee extended to the left knee, the claim was governed by the schedule). Cf. BoiseCascade Corp. v. Jackson, [Ms. 2051041, May 4, 2007] ___ So.2d ___, ___ (Ala.Civ.App. 2007) (stating that "[a]n injury to the knee is considered a scheduled injury to the leg, which, of course, is a larger scheduled member of which the foot is a component. Hence, even if the effects of [the employee's] left-heel injury extend to the left knee, compensation would be fixed by the schedule for a permanent partial loss of use of the leg" (citation omitted)); and Ex parte Dunlop TireCorp., 772 So.2d 1167, 1170 (Ala. 2000) (stating that, under the schedule, "the loss of an arm includes the loss of a hand").
Because the employee's recovery was limited to compensation for a scheduled injury, evidence concerning the employee's vocational disability was irrelevant. Chadwick Timber Co.v. Philon, [Ms. 2050697, March 16, 2007] ___ So.2d ___, ___ (Ala.Civ.App. 2007); Kohler Co. v. Miller,921 So.2d 436, 444 (Ala.Civ.App. 2005); and Smith v. MichelinNorth America, Inc., 785 So.2d 1155, 1159
(Ala.Civ.App. 2000).
 II.
The trial court's judgment states that it found "that the [employee] developed bilateral carpal tunnel syndrome in the line and scope of his employment." (Emphasis added.) The employer argues that the employee's compensation award should be limited to the schedule for the loss of use of one hand — the left — because, it says, the employee did not establish medical causation with respect to the condition of the right hand.
The employee reached MMI for the crush injury to his left hand in February 2001. Two months later, he returned to Dr. Menard, complaining of pain and numbness in his left wrist. Because Dr. Menard thought those symptoms might indicate carpal tunnel syndrome, he referred the employee to Dr. Barnett, an orthopedic surgeon, for nerve-conduction-velocity tests onboth hands. After reviewing those test results, Dr. Menard and Dr. Barnett concluded that the employee suffered from bilateral carpal tunnel syndrome. On August 21, 2001, Dr. Menard performed a carpal tunnel release on the employee's left hand. When asked whether the carpal tunnel syndrome in the employee's left hand was "related to work," Dr. Menard answered, "I think that it certainly could be associated with it, but it could be associated with various other causes of carpal tunnel syndrome. But I certainly have seen carpal tunnel syndrome arise after hand injuries." See Ex parte USXCorp., 881 So.2d 437, 443 (Ala. 2003), in which our supreme court stated:
 "We recognize that the majority of carpal tunnel injuries are caused by gradual deterioration or repetitive motion and, thus, that the clear-and-convincing-evidence burden of proof will apply. However, we cannot ignore the medical possibility, as evidenced by the testimony in this case, that in some cases it is medically possible for carpal tunnel syndrome to result from a one-time acute trauma. The trial court must determine the cause of the carpal tunnel injury and then apply the proper burden of proof. If the trial court determines that the injury was caused by a one-time acute trauma or accident, the preponderance-of-the-evidence burden of proof will apply, in accordance with the burdens set forth by the Legislature in § 25-5-81, Ala. Code 1975."
None of the employee's treating physicians attributed the condition of the employee's right hand to an "`accident arising out of and in the course of the employment,' *Page 105 
within the meaning of the first sentence of § 25-5-1(9)." USX Corp. v. Bradley, 881 So.2d 421, 426
(Ala.Civ.App. 2003), aff'd, Ex parte USX, supra. The only testimony concerning an accidental injury to the employee's right hand came from the employee himself, who described a nonwork-related accident occurring on February 15, 2003, while he was serving in the National Guard.
Hence, in order to be compensable, the condition of the employee's right hand must have resulted from a nonaccidental, "cumulative trauma disorder," arising out of and in the course of his employment, see § 25-5-1(9), Ala. Code 1975. For a nonaccidental injury allegedly caused by gradual deterioration or cumulative physical stress, the clear-and-convincing-evidence standard applies. Ex parteRussell Corp., 725 So.2d 264 (Ala. 1998). To establish legal causation, the employee would have to show that "the performance of his . . . duties as an employee exposed him . . . to a danger or risk materially in excess of that to which people are normally exposed in their everyday lives." Exparte Trinity Indus., 680 So.2d at 267. To establish medical causation, the employee would have to prove that the risk to which he was exposed was, in fact, a contributing cause of the injury. Id. at 269. "Clear and convincing evidence" is defined as
 "evidence that, when weighted against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
§ 25-5-81(c), Ala. Code 1975. Although the employer argues that the employee failed to establish medical causation with respect to the condition of his right hand, we need not address that issue because we conclude that the employee failed to establish legal causation with respect to the condition of his right hand. He presented no evidence, much less clear and convincing evidence, that "the performance of his . . . duties as an employee exposed him . . . to a danger or risk materially in excess of that to which people are normally exposed in their everyday lives." Ex parte TrinityIndus., 680 So.2d at 267.
The judgment of the trial court awarding the employee permanent-partial-disability benefits outside the schedule set forth in § 25-5-57(a)(3)a.12 is reversed, and the cause is remanded for the trial court to enter an award of permanent-partial-disability benefits pursuant to the schedule.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.